**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**RHONDA OFFILL,**

        **Plaintiff,**

    **v.**

**THE CENTRAL RAILROAD**
**COMPANY OF INDIANA, et al.,**

      **Defendants.**

**Case No. 1:24-cv-540**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Plaintiff Rhonda Offill initially sued The Central Railroad Company of Indiana (Central Railroad), Genesee & Wyoming Railroad Services, Inc. (GRSI), INEOS ABS (USA) LLC, INEOS Styrolution America LLC (collectively INEOS), and ABC Corporations 1–20 (the corporate equivalents of John Doe defendants) in Ohio state court. But INEOS removed the case to this Court. Offill now moves to remand. For the reasons stated more fully below, the Court **GRANTS** Offill's Motion to Remand (Doc. 10). And because the parties submitted supplemental briefing on Central Railroad's citizenship, the Court **DENIES** Central Railroad's Motion for Leave to File Sur-Reply in Opposition to Plaintiff's Motion to Remand (Doc. 28) **AS MOOT**.

## BACKGROUND

### A.    Procedural Background

The facts here, though calamitous, are straightforward. On September 24, 2024, a tanker car allegedly leaked styrene—a gaseous chemical—and other hazardous gases into Whitewater Township, Ohio, while parked at a railyard.

(Compl., Doc. 2, #49; INEOS Resp., Doc. 24, #165). Apparently fearing an explosion, local officials evacuated thousands of individuals who lived or worked within a one-half mile radius of the tanker car. (Doc. 2, #49–50). But Offill alleges that some of those residing outside that radius, and who thus were not evacuated, ended up being "exposed to the [styrene] without warning." (*Id.* at #50). Because of the incident, Offill and others allegedly suffered various injuries to the skin, respiratory tract, and eyes. (*Id.*). They also fear future injury and loss of business opportunity. (*Id.*). And the affected individuals will require ongoing medical evaluation and monitoring to determine the long-term impact of the styrene exposure. (*Id.* at #50–51).

Offill brought this putative class action on September 25, 2024, in the Hamilton County Court of Common Pleas against Central Railroad, GRSI, INEOS, and ABC Corporations 1–20. (*Id.* at #45–46). She claims that INEOS produced the styrene in question, leased the tanker car that leaked, and arranged the tanker car's transportation. (*Id.* at #49). Offill further alleges that either Central Railroad or GRSI owns the railyard at which the leak occurred. (*Id.*). And she says ABC Corporations 1–20, whose names and addresses she doesn't know yet, were involved in the "manufacture, transport, maintenance, control, oversight, monitoring, inspection, stabilization, or design" of the tanker car, styrene, and/or the rail line. (*Id.*).

On September 29, 2024, INEOS removed the case to this Court. (Notice of Removal, Doc. 1). In its Notice of Removal, INEOS stated that removal was proper because the Court has original jurisdiction over the case on two independent grounds. First, INEOS pointed to 28 U.S.C. § 1332(a), claiming there is complete diversity

between Offill and all Defendants "properly joined and served." (*Id.* at #1). Second, INEOS said the Court has jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d), since (1) the putative class exceeds 100 members, (2) minimal diversity exists, and (3) the amount in controversy exceeds $5 million. (*Id.*).

Offill, however, disagrees on both fronts and moves to remand the case to state court. She makes three arguments in support. First, she says that INEOS improperly removed the case before any Defendant was properly joined and served, thus violating 28 U.S.C. § 1441(b)(2)'s procedural requirements. (Doc. 10, #87–88). Second, Offill argues that this Court lacks original jurisdiction under § 1332(a) since she, many of the putative class members, and Central Railroad are all Ohio citizens—in other words, there is not complete diversity. (*Id.* at #88, 90). And finally, Offill maintains that the Court lacks original jurisdiction under § 1332(d) since this case meets all four requirements of CAFA's local controversy exception, rendering CAFA an invalid basis for removal. (*Id.* at #89–92).

INEOS responded. (Doc. 24). So did Central Railroad and GRSI. (Doc. 25). Both sets of Defendants argue that Offill incorrectly pleaded Central Railroad's citizenship. (Doc. 24, #168; Doc. 25, #193).[1] Although the Complaint alleges that Central Railroad is incorporated in Indiana with a principal place of business in Ohio, Defendants claim that Central Railroad's true principal place of business is in New

---

[1] Although INEOS responded to Offill's motion separate from Central Railroad and GRSI (who collectively filed a response), the two responses make largely the same arguments. (*See generally* Docs. 24, 25). So the Court will refer to Defendants arguments' collectively throughout this Opinion and Order, unless otherwise specified.

York. (Doc. 24, #169–70; Doc. 25, #192–94). And, according to Defendants, that means the Court has original jurisdiction under both § 1332(a) (since there is complete diversity) and § 1332(d) (since the local controversy exception cannot apply). (Doc. 24, #168–71, 175–78; Doc. 25, #190–98). Defendants also maintain that INEOS properly removed this case under § 1441's procedure. (Doc. 24, #171–75; Doc. 25, #198–200).

Offill replied. (Doc. 27). In that filing, she maintained that "[t]he information [then] presently known strongly indicate[ed] that Central Railroad's principal place of business is in Ohio," and asked the Court to grant her motion. (*Id.* at #206). But she alternatively requested leave to conduct expedited discovery on Central Railroad's principal place of business. (*Id.*).

Central Railroad then moved for leave to file a sur-reply addressing its citizenship and Offill's "contention that complete diversity is lacking." (Doc. 28, #270). INEOS filed a response in support of Central Railroad's motion for leave. (Doc. 29).

After reviewing the parties' first round of briefing (and mindful of its duty to ensure it has subject-matter jurisdiction), the Court determined that expedited discovery on the limited issue of Central Railroad's principal place of business would be beneficial. So the Court held a telephone status conference to discuss how that discovery might proceed. (12/4/24 Min. Entry). As a result of that conference, the parties conferred and submitted a joint discovery plan. That plan allowed Offill to depose two individuals—J. Bradley Ovitt and Brian Stussie—on the narrow issue of Central Railroad's citizenship. Once the depositions were complete, the Court set a schedule for supplemental briefing on the citizenship issue. (Doc. 31).

**B.      Central Railroad's and GRSI's Corporate Structure**

The parties have since filed their supplemental briefs. (Docs. 35, 36, 37, 38). Those briefs (along with the two depositions) shed light on Central Railroad's corporate structure and operations. Here's a primer.

Three companies are pertinent to understanding where Central Railroad sits in the relevant corporate architecture: (1) Genesee & Wyoming, Inc. (GWI) (who is not a party to this lawsuit, and whose website is gwrr.com, a fact that becomes relevant below), (2) GRSI, and (3) Central Railroad. GWI is a holding company for both GRSI and Central Railroad (along with many other subsidiary railroads). (Ovitt Dep., Doc. 33, #301). GRSI, in turn, "provides administrative and operational support services" to Central Railroad (and to GWI's other subsidiaries) based on an agreement under which Central Railroad pays a management fee to GRSI for those services. (*Id.* at #301–02, 319; Ovitt Supp. Decl., Doc. 37-1, #577). In other words, GRSI and Central Railroad are separate, "sister companies." (Stussie Dep., Doc. 34, #430). Central Railroad assumes responsibility for its own financial obligations and contracts, (Doc. 33, #356–57); is responsible for its own profits and losses, (*id.* at #357); and has separate books and financial statements, (*id.* at #357–58). In terms of business, Central Railroad operates a railway that runs between Indiana and Ohio. (*See* Doc. 34, #491).

Several individuals have a hand in Central Railroad's operations, though five are particularly relevant here: Bradley Ovitt, Brian Stussie, John Keffer, Rob Payne, and Josh Hollingsworth. Ovitt serves as GRSI's Senior Vice President (VP) of National Region Railroads and as Central Railroad's Senior Vice President. (Doc. 33,

#300, 303; Doc. 37-1, #576). As a Senior VP at GRSI, Ovitt also serves as Senior VP for each of the other railroads in his region (i.e., Central Railroad's sister corporations). (Doc. 33, #307–08). Moving along, Stussie is one of GRSI's six Divisional Vice Presidents, and he's also Central Railroad's President. (Stussie Dep., Doc. 34, #420, 424; Stussie Supp. Decl., Doc. 37-2, #592). Keffer, for his part, is both Central Railroad's General Manager and its Vice President. (Keffer Decl., Doc. 23-3, #159). Payne is Central Railroad's Assistant General Manager. (Doc. 34, #490). And Hollingsworth is Central Railroad's Trainmaster. (*Id.* at #449). The chain of command goes in reverse. Hollinsworth reports to Payne, who reports to Keffer, who reports to Stussie, who reports to Ovitt. (Doc. 33, #362; Doc. 34, #428–29, 500–01).

But those individuals don't all work from the same location. Ovitt works out of a GRSI conference room or a visitor's office in Rochester, New York "at least once a month," and otherwise works from his home in Vermont—unless, of course, he's traveling. (Doc. 33, #315, 323, 329–30). Ovitt travels "extensively" for work, usually around ten days per month. (*Id.* at #329). So on those days, Ovitt works from wherever he's visiting. (*Id.* at #329–30). Stussie, by contrast, works out of Central Railroad's "headquarters" in Cincinnati, Ohio. (Doc. 34, #458–59, 471). Keffer and Hollingsworth both have offices there, too. (*Id.* at #471). And there's one other important location: an office in Cleves, Ohio (a town about 20 miles west of downtown Cincinnati). That's where Central Railroad's servicing line is located, and thus where most of Central Railroad's employees report to "go on and off duty." (*Id.* at #451).

With that background in mind, the Court turns to the parties' arguments. After two rounds of briefing, the matter is ripe for review.

## LEGAL STANDARD

A motion to remand challenges the Court's subject-matter jurisdiction over a dispute removed from state court. *See Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006). A party may remove an action from state court if the federal court to which the action is removed would otherwise have had original jurisdiction. 28 U.S.C. § 1441(a). The defendant, as the removing party (and thus the party invoking the Court's jurisdiction), bears the burden of proving the federal court has jurisdiction in response to a motion for remand. *Eastman*, 438 F.3d at 549. In determining its jurisdiction over a removed action, a court is limited to the legal bases the removing defendant asserted in its timely filed notice of removal. *Miller v. Adamo Grp.*, 1:22-cv-14, 2022 WL 1013090, at *3 (S.D. Ohio Apr. 5, 2022); 28 U.S.C. § 1446(a) (explaining that a defendant must file "a notice of removal … containing a short and plain statement of the grounds for removal"). In evaluating the asserted grounds for removal, though, a district court is not limited to the factual allegations in the complaint. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1087 n.11 (6th Cir. 2010). Rather, it enjoys wide discretion in the evidence it may review to assess its subject-matter jurisdiction. *Id.* But that latitude does not extend temporally—"removal jurisdiction is assessed based on the facts as they existed at the time of removal." *Total Quality Logistics, LLC v. Summit Logistics Grp., LLC*, 606 F. Supp. 3d 743, 747 (S.D. Ohio 2022).

## LAW AND ANALYSIS

Whether the Court must remand this case turns largely on one question: Where is Central Railroad's principal place of business? Recall that INEOS asserted two grounds for removing this action: (1) diversity jurisdiction under § 1332(a) and (2) CAFA. (Doc. 1, #1). The propriety of both of those grounds depends, at least in part, on Central Railroad's citizenship. If Central Railroad's principal place of business is in New York, as Defendants suggest, then the Court has diversity jurisdiction (because Defendants are completely diverse from Offill) and CAFA jurisdiction (because the local controversy exception doesn't apply). But if Central Railroad's principal place of business is in Ohio, as Offill suggests, then the Court lacks diversity jurisdiction.[2] And because of that (coupled with a few additional facts), the local controversy exception also applies, meaning the Court lacks CAFA jurisdiction too. Below, the Court considers both diversity and CAFA jurisdiction, in that order, but spoiler alert—the Court concludes that Offill is correct.

### A. Central Railroad's Principal Place of Business Is in Ohio, So the Court Lacks Diversity Jurisdiction.

A party asserting diversity jurisdiction must make two showings: (1) that the parties are completely diverse, and (2) that the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). No one disputes the amount in controversy element.

---

[2] Offill also complains that INEOS improperly removed the case before any Defendant had been served. (Doc. 10, #87–88). And that, she says, runs afoul of 28 U.S.C. § 1441(b)(2) (the forum defendant rule), which prohibits removal "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." (*Id.* at #87). But because the Court agrees that it lacks subject-matter jurisdiction, it doesn't matter whether INEOS's removal was procedurally proper or not. The Court, therefore, need not (and does not) reach this alternative "snap removal" argument.

Rather, Offill and Defendants disagree about whether the parties are completely diverse—that is, whether "no plaintiff is a citizen of the same state as any defendant." *V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 355 (6th Cir. 2010). But even on that front, the parties substantially agree.[3] As a result, the dispute before the Court turns on only Central Railroad's citizenship, and specifically, Central Railroad's principal place of business.

A corporation, like Central Railroad, is a citizen of both (1) the state in which it is incorporated and (2) the state where is has its principal place of business. 28 U.S.C. § 1332(c)(1). Everyone agrees that Central Railroad is incorporated in Indiana. (Doc. 2, #48; Doc. 24, #165; Doc. 25, #190). But the location of Central Railroad's principal place of business has proven more elusive.

A corporation's principal place of business is located wherever its "officers direct, control, and coordinate the corporation's activities"—what the Supreme Court calls the corporation's "nerve center." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Usually (and perhaps unsurprisingly), that nerve center is the corporation's headquarters. *Id.* at 93. But not always. *See id.* Sometimes the nerve center is trickier to discern, such as when a corporation "divide[s] its command and coordinating functions among officers who work at several different locations." *Id.* at 95–96. And

---

[3] The parties seemingly agree that: (1) Offill is a citizen of Ohio; (2) the INEOS Defendants, which are LLCs, are citizens of Delaware, Germany, England, and Wales; and (3) Genesee is a citizen of Delaware and Florida. (Doc. 2, #47–49; Doc. 24, #168 ("Offill does not challenge this fact, or raise any suggestion that INEOS shares citizenship with the named Plaintiff or any class putative member."); Doc. 25, #187, 190 n.1 ("Plaintiff does not dispute, and thus concedes, that … the INEOS defendants and GRSI are diverse.")). So, again, the parties' disagreement centers only on Central Railroad's citizenship.

sometimes anomalous results may arise. For example, if most of a corporation's visible business activities take place in one state, but the commanding officers direct its activities in another state, the principal place of business is where the commanding officers are located. *Id.* at 96. Conversely, though, a location that is merely "a mail drop box" or "a bare office with a computer" is not a corporation's nerve center. *Id.* at 97. And importantly, it is Defendants—as the parties asserting diversity jurisdiction—that hold the burden of persuasion and must offer "competent proof" of Central Railroad's principal place of business. *Id.* at 96–97.

Defendants say that Central Railroad's principal place of business is in New York. Why? Because Ovitt is "the boss" who "make[s] all final decisions on behalf of [Central Railroad] other than those that [he] delegate[s]" to Stussie and Keffer from an office in Rochester. (Doc. 33, #303; Doc. 36, #555–60; Doc. 37, #568–71). Offill disagrees. She classifies Ovitt as a mere overseer with most of Central Railroad's actual decision-making authority falling to Stussie, Keffer, and Hollingsworth. (Doc. 35, #547–48). And she highlights that Central Railroad is its own company—one that the parent holding company (GWI) holds out as headquartered in Cincinnati, Ohio. (*Id.* at #548–49); *see also Central Railroad of Indiana (CIND) Overview*, Genesee & Wyoming Inc., https://perma.cc/GRZ6-HVDU (GWI website listing "Railroad Headquarters" for Central Railroad as 2856 Cypress Way, Cincinnati, Ohio, 45212). At day's end, the Court agrees with Offill.

To start, Central Railroad's President, Brian Stussie, testified that the company is headquartered in Cincinnati, Ohio. (Doc. 34, #453). That alone could

perhaps end the inquiry. *Hertz* explained that a corporation's "'nerve center' will typically be found at [its] headquarters." 559 U.S. at 81. True, typically is not always. But, based on the record, this situation falls on the typical side of things. From Cincinnati, Keffer directs Central Railroad's activities "from a monthly perspective," and Stussie coordinates operations with an annual perspective in mind. (Doc. 34, #450). As Stussie put it, "[t]he headquarters at Cypress Way [in Cincinnati] is where our operating plans are formed and implemented." (*Id.* at #501). And in terms of developing corporate strategy, Stussie and Keffer make up the front line. They formulate Central Railroad's capital plan and develop its budget. (*See* Doc. 33, #346). Admittedly, they then elevate their proposals to Ovitt for approval, who in turn elevates his intermediate approval to Michael Miller (GWI's CEO) for final approval. (*Id.* at #346–47; Doc. 34, #467). But, as further discussed below, that is often the way of the world for subsidiary companies collected under a holding company's umbrella— the subsidiary company's day-to-day operations are handled by the team on the ground, while overarching strategic decisions that may impact other entities in the shared governance structure require approval from individuals within other teams.

In terms of controlling the Central Railroad-specific strategy and operations— scheduling train crews, handling customers' needs, coordinating track maintenance, hiring most employees, and executing strategic and capital plans—that all happens in Ohio. (*See* Doc. 34, #440–42, 483). And as one more straw on an already heavily laden camel's back, any Central Railroad mail that GRSI's Rochester office receives is "scanned and e-mailed" to Stussie in Cincinnati. (*Id.* at #461–62). In short, Central

Railroad's Cincinnati office is "not simply an office where the corporation holds its board meetings." *Hertz*, 559 U.S. at 93. Rather, all available evidence points to Cincinnati as the "actual center" of Central Railroad's "direction, control, and coordination." *Id.*

Nor is that surprising. The Supreme Court's nerve-center doctrine relating to a company's principal place of business arose largely against the backdrop of multi-site corporations. *See Hertz*, 559 U.S. at 89–92. A vertically integrated supplier, for example, may have factories in multiple states, with warehouse centers located elsewhere, and distribution sites in yet more states. Deciding which one among the many states had a "principal" corporate presence proved challenging for courts, which variously pointed to the state with the largest number of employees, amount of revenues, or other corporate metrics as the key. *See id.* With that as the factual context, emphasizing a "nerve center" makes sense—the location where principal *coordination* of the activities at all those multiple sites occurs is treated as a corporate "home" of sorts. But here, Central Railroad owns a single asset—a less-than-100-mile stretch of railroad track in Indiana and Ohio—and it principally directs, controls, and manages that asset from a single location, 2586 Cypress Way, Cincinnati, Ohio.

True, Ovitt, works out of a conference room in Rochester, New York, a few days a month, and he admittedly holds something of a veto power over certain things: capital plans, (Doc. 33, #331–32); hiring decisions that exceed Central Railroad's budget, (*id.* at #351); above-budget expenditures, (*id.* at #336); legal settlements, (*id.*); and other overarching corporate policies that GRSI develops for application across all

of its subsidiary railroads, (*id.*). But that does not suffice to crown Rochester as Central Railroad's nerve center. Two reasons explain why.

To start, Ovitt estimates that he devotes only *two percent* of his time to Central Railroad. (*Id.* at #313–14). And that estimate makes sense, as Central Railroad is merely one of forty regional railroads in Ovitt's oversight portfolio. (*See id.*). But Ovitt making the ultimate decision on limited matters for Central Railroad (as he does for the thirty-nine other railroads) does not render him the "nerve center" for "directing, controlling, and coordinating" Central Railroad's overall activities. To the contrary, in delegating the bulk of the direction, control, and coordination of Central Railroad's operations to Stussie and Keffer, (Doc. 33, #303, 336, 362; Doc. 34, #450), Ovitt "effectively transplanted" Central Railroad's nerve center to Cincinnati. *Brewer v. SmithKline Beacham Corp.*, 774 F. Supp. 2d 720, 729–30 (E.D. Pa. 2011). After all, *Hertz* says that it is those things—direction, control, and coordination—that matter when it comes to determining a corporation's principal place of business. 559 U.S. at 92–93. Remember, the key here is where Central Railroad's "brain" resides. *See id.* at 95. And it would be a sad state of affairs if Central Railroad's "brain" operated only two percent of the time.

Plus, even if the Court were to conclude that Ovitt is the be-all, end-all when it comes to Central Railroad, it still wouldn't follow that Rochester, New York, is Central Railroad's principal place of business. Ovitt spends approximately ten business days each month traveling. (Doc. 33, #329–30). The days he's not traveling, Ovitt works from either his home in Vermont or from a visitor's office in the Rochester

13

building. (*Id.*). Why, then, is Rochester (where he doesn't have an established office), as opposed to Vermont (or some other office from which he also sometimes works), Central Railroad's principal place of business? The Court is unsure, and Defendants offer no explanation other than highlighting that two additional Central Railroad officers—the treasurer and vice president, whose actual job functions they barely describe—work out of the Rochester office. (Doc. 36, #558 n.3; Doc. 37, #565–66).

Beyond the issue of Ovitt's nomadic work habits, another point bears mention: Central Railroad is a distinct corporate entity from GRSI. (Doc. 34, #430; *see also* Doc. 33, #356–58). And separately incorporated entities are "considered to have [their] own principal place[s] of business." *See Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 283 (6th Cir. 1990) (quotation omitted). Here, the Court's sole job is to determine *Central Railroad's* principal place of business, not GRSI's, nor that of the many other subsidiary companies in the GWI portfolio. *See id.* (explaining that "jurisdiction over [a] subsidiary is determined by that corporation's citizenship, not the citizenship of the parent"); *see also Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 62–63 (1st Cir. 1993) (highlighting that the principal place of business inquiry "must focus *solely* on … the corporation whose principal place of business is at issue").

Homing in on Central Railroad's activities, as opposed to GRSI's, reaffirms that Cincinnati wins the corporate brain game. Recall that Central Railroad's and GRSI's (its sister corporation) relationship is based on GRSI "provid[ing] business, operational, and administrative support services" to Central Railroad through an agreement. (Doc. 37-1, #577; *see also* Doc. 33, #301, 319). Granted, within that

14

agreement, it is not crystal clear where GRSI ends, and Central Railroad begins. And compounding the confusion, Ovitt and Stussie each have corporate roles at both GRSI and Central Railroad. (Doc. 37-1, #576; Doc. 37-2, #592). But ultimately, the companies' interconnectedness doesn't alter Central Railroad's principal place of business. For example, in the somewhat analogous parent-subsidiary context, even if a parent corporation "exerts a high degree of control through ownership or otherwise" over the subsidiary, and "even if the separateness is perhaps only formal, the subsidiary's place of business is controlling for diversity purposes if the corporate separation is real and carefully maintained." *Schwartz*, 913 F.2d at 283 (quotation omitted). The Court sees no reason (and Defendants provide no reason) why that logic does not extend also to a subsidiary-subsidiary relationship. So long as there are two truly distinct corporations, the Court must respect the separate existence of each.

Here, so far as the Court can tell, Central Railroad and GRSI have maintained separateness, despite having overlapping employees. Central Railroad, for example, assumes responsibility for its own contracts, fulfills its own financial obligations, and has its own financial statements. (Doc. 33, #356–58). So, whatever GRSI's nerve center may be, that does not impact the Court's analysis of Central Railroad. Yet Defendants appear to point to decisions that Ovitt makes based on his authority as a Senior VP *at GRSI*, not as an officer of Central Railroad, to support their argument. (*See, e.g.*, Doc. 36, #557–60). In other words, one could understand Ovitt's decision-making authority to fall closer in line with GRSI's provision of support services,

rather than Central Railroad's activities. His activities for GRSI, however, simply do not carry the day.

The discussion in *DeLuca v. Allstate New Jersey Ins. Co.*, No. 11-4129, 2011 WL 3794229 (D.N.J. Aug. 25, 2011), aptly illustrates the point. There, the court determined that the subsidiary-defendant's "location of day-to-day control and coordination" was in New Jersey, not in Illinois where its parent company was located. *Id.* at *5 (quotation omitted). And it highlighted, among other things, that the subsidiary-defendant was "created and formed specifically to address New Jersey's unique insurance market" and that it "operate[d] almost exclusively in th[e] state." *Id.* So even though a board of directors potentially "ma[de] major decisions and set[] policies" from Illinois, that did not alter the principal place of business. *Id.* (quotation omitted). The same goes here. Central Railroad's line uniquely services Ohio and Indiana and operates in those two states. (Doc. 37-1, #578). Hollingsworth handles day-to-day coordination, Keffer month-to-month, and Stussie year-to-year, all from Ohio. (Doc. 34, #450). Ovitt's retention of some approval and policy-making power—which he (sometimes) exercises from a Rochester office in his capacity at GRSI—does not overcome the other evidence pointing to Cincinnati as Central Railroad's principal place of business. If it did, "every independently incorporated, [] subsidiary which is part of a large conglomerate would be treated (for diversity jurisdiction purposes) as a mere division of a large company rather than a separate corporation." *EverNu Tech., LLC v. Rohm & Haas Co.*, No. 10-2635, 2010 WL

3419892, at *4 (E.D. Pa. Aug. 26, 2010) (quoting *Topp v. CompAir Inc.*, 814 F.2d 830, 835 (1st Cir. 1987)).

Taken together, Defendants have not met their burden of persuading the Court that Central Railroad's (as opposed to GRSI's) principal place of business is in New York. And in light of the Court's duty to resolve all doubts against removal, *Mays v. City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017), the Court concludes that Central Railroad's principal place of business is in Ohio.

Defendants resist the Court's conclusion in three main ways. First, they argue that Offill has duped the Court into eyeballing Central Railroad's "general business activities" to discern its principal place of business, thus contravening *Hertz*'s test. (Doc. 36, #553–54; Doc. 37, #568–71). In fairness to Defendants, *Hertz* did dispense with the "business activities" test courts had been using to find a corporation's principal place of business, replacing it instead with the nerve center test. 559 U.S. at 90–95. Offill, however, has committed no such trickery.

Stussie and Keffer—two of Central Railroad's officers—formulate preliminary corporate strategy from Cincinnati, direct the company's activities from Cincinnati, and coordinate the company's monthly and yearly objectives from Cincinnati. (Doc. 34, #450, 501). That satisfies the nerve center test. True, Central Railroad's day-to-day, general business activities also occur in Ohio. But that's unsurprising given both that its railroad is partially located there and that its employees are located there. And in any event, a corporation's nerve center and the location of its general business activities aren't mutually exclusive. *See Elite Integrated Med., LLC v. New World*

*Comm'ns of Atlanta, Inc.*, No. 1:19-cv-5214, 2021 WL 1663444, at *8 (N.D. Ga. Apr. 28, 2021) ("[When] the daily operations happen to occur at the same locale where those operations are directed, controlled, and coordinated the operations facility and the nerve center collide." (cleaned up)). Besides, to determine Central Railroad's nerve center, the Court "must assess what type of business activities are being controlled, coordinated and directed." *Id.* In that sense, Offill properly points to Hollingsworth—who is Central Railroad's Trainmaster, but not an officer, (Doc. 34, #449)—as relevant to that inquiry. Hollingsworth handles day-to-day matters like which trains to use, crew scheduling, and customer prioritization. (*Id.* at #450). While the location of those business activities may not matter for the nerve center determination in a direct sense, Stussie's and Keffer's (and to some extent Payne's) direction, control, and coordination of those activities from Cincinnati does.

Next, Defendants urge the Court to read *Hertz* as imposing an "ultimate decisionmaker" test and to find that Ovitt fills that role for Central Railroad. (Doc. 36, #555–58; Doc. 37, #571–72). Again, Defendants' reasoning falls short. Ovitt is the ultimate decision-maker for only *some* of Central Railroad's activities. (*See, e.g.*, Doc. 33, #337–38, 351, 353). And even then, Ovitt must sometimes elevate his own approval to GWI's CEO, Miller, for final approval. (*See, e.g.*, Doc. 33, #337, 346–47). Given that the buck seemingly stops with Stussie and Keffer on some matters, Ovitt on others, and Miller on yet others, the Court cannot conclude that it's Ovitt who deserves the ultimate decision-maker title.

18

Beyond that, the cases Defendants cite in support of such a rule are unpersuasive. Take *Hoschar v. Appalachian Power Co.*, 739 F.3d 163 (4th Cir. 2014), for example. Defendants rely on its statement that "ultimate control *is* actual control, provided that ultimate control amounts to directing, controlling, and coordinating the corporation's activities." *Hoschar*, 739 F.3d at 173. No doubt that is true. Defendants' problem, though, is that Ovitt spending two percent of his time rubber stamping decisions that Stussie and Keffer formulated hardly amounts to complete direction, control, and coordination of Central Railroad. He plays a role, to be sure. But not enough of a boots-on-the-ground role to place Central Railroad's principal place of business in New York.

Nor do the other cases they cite offer them much help. Stussie is not like the president in *Tour Strategy LLC v. Star-Telegram, Inc.*, whose every decision was "subject to review, reversal, and modification" by others. *See* No. 4:18-cv-74, 2018 WL 1796555, at *3 (N.D. Tex. Apr. 16, 2018). To the contrary, Stussie has authority to make several decisions on Central Railroad's behalf without Ovitt's approval or oversight. As for *Pegasus Industries, Inc. v. Martinrea Heavy Stampings, Inc.*, "no [] officers or directors reside[d] in or work[ed]" in the subsidiary's Kentucky plant, which was instead simply where employees manufactured products. No. 3:16-cv-24, 2016 WL 3043143, at *3 (E.D. Ky. May 27, 2016). The officers themselves were located at the parent corporation's headquarters in Ontario, Canada, which the court thus concluded was the principal place of business. *Id.* at *2–3. But things are far different here. Stussie and Keffer—both of whom are Central Railroad officers—work from

19

Cincinnati and direct much of the corporation's activities from there. That leaves *Bauer Foundation Corp. v. IMI Tennessee, Inc.*, No. 3:19-cv-849, 2019 WL 6273253 (M.D. Tenn. Nov. 25, 2019). There, a non-officer divisional president's affidavit stating that the subsidiary's operations were controlled from its parent's headquarters "just barely clear[ed] the bar" to place the subsidiary's nerve center at its parent's headquarters. *Id.* at *6. Again, that doesn't help Defendants. At the risk of undue repetition, Stussie and Keffer are Central Railroad officers who control much of its operations from its headquarters in Cincinnati without Ovitt's oversight.

Finally, Defendants attempt to blur the lines between Central Railroad and GRSI, arguing that regardless of corporate formalities, Ovitt directs and controls Central Railroad from Rochester. (Doc. 36, #559–60). According to Defendants, Ovitt's, Stussie's, and Keffer's Central Railroad corporate officer titles—Senior VP, President, and VP, respectively—are purely nominal. (Doc. 37, #566–67 ("[Central Railroad] corporate officer titles are not hierarchical and do not reflect a reporting structure or ultimate authority.")). Rather, it's their human resource titles—GRSI Senior VP, GRSI Divisional VP, and Central Railroad General Manager, respectively—that matter. (*See id.*). At the outset, Court finds it difficult to flat out ignore Stussie's and Keffer's *Central Railroad titles* in favor of their human resources titles, when the relevant question is where *Central Railroad's officers* direct, control, and coordinate the corporation. At any rate, even accepting that arrangement as true, Ovitt delegated away most of his Central Railroad decision-making authority to Stussie and Keffer. And as the Court noted, in doing so, he transplanted the nerve

center from Rochester (if it was ever there) to Central Railroad's headquarters in Ohio.

The Supreme Court recognized that the "nerve center" test would lead to "hard cases" and that "counterintuitive results" might arise. *Hertz*, 559 U.S. at 95–96. Perhaps this is one of those instances. But that doesn't relieve the Court of its obligation to look for the "center" of Central Railroad's "overall direction, control, and coordination." *Id.* at 96. Based on the evidence before it, the Court concludes that Central Railroad's principal place of business is Ohio for diversity jurisdiction purposes. And since Offill is also an Ohio citizen, the Court lacks diversity jurisdiction over this matter. *See* 28 U.S.C. § 1332(a).

**B.      The Court Also Lacks Jurisdiction under CAFA Because its Local Controversy Exception Applies.**

That leaves CAFA. According to Defendants, CAFA supports removal even if diversity jurisdiction doesn't. (*See* Doc. 1, #1). Offill counters that CAFA won't work because its local controversy exception applies, which means the Court doesn't have subject-matter jurisdiction. (Doc. 10, #89–92). Again, Offill is right.

CAFA jurisdiction exists when (1) the plaintiff seeks relief on behalf of a class that encompasses at least 100 members; (2) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (3) minimal diversity exists between the parties; and (4) the action does not fall within one of the enumerated exceptions. 28 U.S.C. § 1332(d); *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013). One of those exceptions is the local controversy exception. 28 U.S.C. § 1332(d)(4). No one

disputes that the first three elements are present. So it all comes down to whether the local controversy exception applies.

Under that exception, the Court must decline to exercise jurisdiction if: (1) over two-thirds of the putative class members are citizens of the original state of filing; (2) the plaintiff seeks "significant relief" from at least one defendant "whose alleged conduct forms a significant basis for the claims asserted" and who is a citizen of the original state of filing; (3) the putative class members incurred their "principal injuries" in the original state of filing; and (4) no other similar class actions were filed within three years of the instant class action. 28 U.S.C. § 1332(d)(4)(A).

But importantly, the burden of proof for the analysis here is different from the one that applied in resolving diversity jurisdiction. Here, Offill, as the party seeking to remand under a CAFA exception, is the one who must "establish[] each element of the exception by a preponderance of the evidence." *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 388–89 (6th Cir. 2016). And unlike before, where the Court was to resolve doubts against removal, "no antiremoval presumption attends cases invoking CAFA." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

In arguing that the local controversy exception does not apply, Defendants attack only the second element, (Doc. 24, #175–78; Doc. 25, #194–98), which itself has three parts: significant relief, significant basis, and home-state defendant. The Court therefore analyzes each in reverse order.

22

Start with whether there's a home-state defendant. As explained above, there is. Central Railroad's principal place of business is in Ohio, making it an Ohio citizen for jurisdictional purposes. Offill, therefore, met her burden here.

Turn to whether Central Railroad's alleged conduct forms a significant basis for Offill's claims. To determine the magnitude of Central Railroad's role in this controversy, the Court must compare its alleged conduct to the other Defendants' alleged conduct. *Mason*, 842 F.3d at 395–96. Then, if Central Railroad's alleged conduct is an "important ground" for Offill's claims and forms a "significant part" of the overarching allegations, Offill has satisfied the "significant basis" provision. *Id.* at 396 (quotation omitted).

But what must a plaintiff allege to show that a defendant's conduct is an "important ground" for her claims? Circuits are split. Some require the relevant "complaint [to] distinguish[] the conduct of [the local defendant] from the conduct of the other defendants" before the local defendant's conduct may count as an important ground of the plaintiff's claims. *See, e.g.*, *Kitchin v. Bridgeton Landfill, LLC*, 3 F.4th 1089, 1095 (8th Cir. 2021) (quotation omitted); *Opelousas Gen. Hosp. Auth. v. FairPay Sols., Inc.*, 655 F.3d 358, 362–63 (5th Cir. 2011). In other circuits, though, even where the local and non-local "defendants are alleged to have engaged in identical conduct forming the basis for all of plaintiffs' claims," the local defendant's conduct may yet qualify as an important ground. *See, e.g.*, *Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, 121 F.4th 228, 241–42 (1st Cir. 2024); *Coleman v. Estes Express Lines, Inc.*, 631 F.3d 1010, 1020 (9th Cir. 2011). The Sixth Circuit hasn't specified which test applies,

though it has implied that the latter does. *See Mason*, 842 F.3d at 395–96 (finding that a local subsidiary company's conduct formed a "significant basis" of the claims even where the complaint's allegations conflated the subsidiary's and the non-local parent company's role in the dispute); *id.* at 399–400 (Kethledge, J., dissenting) (explaining that the complaint, after naming the two related defendants separately, "proceed[ed] to define both [] entities collectively"). Based on the Court's best reading of the available tea leaves, the Court will thus apply the latter test here.

After making the requisite comparison, the Court concludes that Offill has met her burden. The Complaint alleges that styrene leaked from a tanker car parked at a railyard that "Central Railroad and/or [GRSI]" owned. (Doc. 2, #49). And it alleges that INEOS "produced or owned the styrene in question, leased the Tanker Car that transported it, and made arrangements for its transportation." (*Id.*). Offill, in turn, asserts various negligence claims based on Defendants "negligently manufacturing, transporting, *maintaining*, *stabilizing*, *monitoring*, *overseeing*, *inspecting and/or controlling the rail line* upon which the leaking Tanker Car was located." (*Id.* at #54 (emphasis added)). She further asserts various nuisance claims based on Defendants "allowing styrene to escape into the open air." (*Id.* at #55, 57).

The gravamen of Offill's action, in other words, is Defendants' collective negligence in preventing the styrene leak. And since she "target[s]" both INEOS's alleged handling of the tanker car and Central Railroad's and GRSI's alleged maintenance and monitoring of the rail line, *see Adams v. 3M Co.*, 65 F.4th 802, 806 (6th Cir. 2023), Central Railroad's alleged role in the styrene leak is an equally

24

important ground for her claims as GRSI's or INEOS's, *see Mason*, 842 F.3d at 395–96. Beyond that, Offill asserts all eight of her claims against Central Railroad. *See Fernandes v. D.R. Horton, Inc.*, No. 2:24-cv-3928, 2025 WL 1008079, at *8–9 (D.S.C. Apr. 4, 2025) (weighing the "implicat[ion]" of the home-state defendants "in every cause of action pleaded by the plaintiffs" in favor of finding a significant basis). In sum, the Court is satisfied that Offill met her burden in showing by a preponderance that Central Railroad's alleged conduct formed a significant basis for the action.

Finally, consider whether Offill seeks significant relief from Central Railroad. The Sixth Circuit hasn't yet laid out a test for this provision either. But other circuits have. The Fifth Circuit, for example, decided that "[a]ll that matters is what the plaintiffs seek in damages." *Louisiana, ex rel. Div. of Admin. v. I3 Verticals Inc.*, 81 F.4th 483, 493 (5th Cir. 2023). If they seek "significant relief from an in-state defendant, then they satisfy the prong." *Id.* Offill does just that. She seeks damages from Defendants jointly and severally. *See Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1244–45 (10th Cir. 2009) (affirming the district court's determination on the significant relief provision); *see also Fernandes*, 2025 WL 1008079, at *10 (collecting cases where courts relied on the complaint seeking joint and several liability to find the significant relief provision met). Said differently, "every potential plaintiff is entitled to recover from [Central Railroad]," which renders the relief significant. *Powell v. Tosh*, No. 5:09-cv-121, 2009 WL 3484064, at *5 (W.D. Ky. Oct. 22, 2009) (quoting *Coffey*, 581 F.3d at 1244). Offill, thus met her burden on all three parts of CAFA's second element.

Attempting to deflect CAFA's local controversy exception, Defendants offer three counterarguments. None persuade.

As for the significant basis provision, Central Railroad and GRSI argue that Offill has not sufficiently compared Central Railroad's conduct to that of the other Defendants. (Doc. 25, #195–98). True, the Complaint could have perhaps more precisely delineated each Defendant's alleged role in the styrene leak. But, as noted, the Sixth Circuit has at least suggested that such a defendant-by-defendant allocation of responsibility is not a prerequisite to establishing that a given defendant's conduct forms a significant basis for the plaintiff's claims. *See Mason*, 842 F.3d at 395–96. And in any event, while the Complaint's allegations err on the general side, the Complaint does sufficiently compare Defendants' alleged conduct. Start with Central Railroad versus INEOS. Offill bases her claims as much on INEOS's alleged misconduct concerning the tanker car as on Central Railroad's and GRSI's alleged misconduct concerning the rail line. In other words, Central Railroad has "offered no reason for thinking" its potential liability would somehow merely be derivative of INEOS's (i.e., insignificant). *See Adams*, 65 F.4th at 806 (raising the opposite concern). So the allegations against INEOS do not stand in the way of finding that Central Railroad's conduct was a "significant basis" for the claims.

The distinction between Central Railroad and GRSI, on the other hand, is admittedly a closer call. The Complaint equivocates about which one owns the railyard at issue. (*See* Doc. 2, #49). But given Central Railroad's concession that it operates the relevant rail line, (*see, e.g.*, Doc. 37, #564), the Court finds that

equivocation insignificant. Offill's negligence claims, for example, center on Defendants negligently maintaining and controlling *the rail line* on which the leaky tanker car sat. If it is Central Railroad, not GRSI, that in fact operates that rail line, it's hard to see how Central Railroad (who presumably holds a duty of care as operator) somehow played a less significant role than GRSI in connection with that operational conduct. To the contrary, the natural conclusion would be that GRSI is the less significant party as between the two.

Central Railroad and GRSIs' second counterargument protests the significant relief provision. They again argue that Offill hasn't shown that the relief she seeks from Central Railroad is "comparative[ly] significan[t] relative to the relief" she seeks from other Defendants. (Doc. 25, #198 (quotation omitted)). But for the reasons already explained, she has. The Complaint, by directing each cause of action at Central Railroad, suggests that the relief Offill seeks from Central Railroad is just as significant as the relief she seeks from any other Defendant. (*See* Doc. 2, #53–60).

That leaves the third counterargument. INEOS mounts a more generalized attack, complaining that this action isn't a "'truly local' controversy." (Doc. 24, #177–78). According to INEOS, the tanker car travelled in interstate commerce from Texas to Ohio. (*Id.* at #177). And that apparently means this case does not involve a local controversy because the case could involve federal environmental or transportation regulations. (*Id.* at #178). Though the Court is mindful that CAFA seeks to ensure federal court consideration of cases that "will have long-lasting implications for interstate commerce" and will have effects "far beyond" the relevant region,

27

*Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 910 (6th Cir. 2017), this is not one of those cases.

Offill alleges that a tanker car parked in Whitewater Township, Ohio, leaked styrene gas into the air, causing local officials to evacuate thousands of individuals located within a one-half mile radius. (Doc. 2, #47–51). And she claims those local Ohio residents suffered negative health consequences and lost wages as a result. (*Id.* at #50–51). Those allegations smack of a localized controversy. So even if federal regulations play some role in this case, as INEOS suggests they might, the Court cannot agree that they'll play such a significant role as to transform this case into one having "long-lasting" interstate commerce implications or far-reaching effects. This is not a case, for example, where Defendants allegedly marketed and sold defective products throughout the country. *See, e.g.*, *Winn v. Mondelez Int'l, Inc.*, No. 17-cv-2524, 2018 WL 3151774, at *5 (N.D. Cal. June 28, 2018). As the Court sees it, this is a "a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all others." *Quicken Loans Inc. v. Alig*, 737 F.3d 960, 966 (4th Cir. 2013) (quotation omitted).

## CONCLUSION

For the reasons explained, the Court **GRANTS** Offill's Motion to Remand (Doc. 10) and **REMANDS** this action to the Court of Common Pleas for Hamilton County, Ohio. Because the parties submitted supplemental briefing on Central Railroad's citizenship, the Court further **DENIES** Central Railroad's Motion for Leave to File Sur-Reply in Opposition to Plaintiff's Motion to Remand (Doc. 28) **AS MOOT**.

Finally, the Court **INSTRUCTS** the Clerk to enter judgment and **TERMINATE** this matter on its docket.

      **SO ORDERED.**

June 30, 2025
**DATE**

                            **DOUGLAS R. COLE**
                            **UNITED STATES DISTRICT JUDGE**